Case number 20-2600, Northern Iowa, David Bills v. Cactus Family Farms, et al. Ms. Bullock? Thank you, Your Honor. May it please the Court? My name is Laura Bullock. I'm here on behalf of Appellant Dave Bills. Your Honor, this case is in regards to the FLSA, the Fair Labor Standards Act, which requires employers to pay their employees time and a half unless an exemption applies. Rather than beginning with the overview of the general framework of the agriculture exemption, which is what is at issue in this appeal, I will leave that work to the party's briefing and focus instead on the two actual issues that are in dispute today. We are here on appeal from a motion for summary judgment. Mr. Bills has appealed the district court's granting of Cactus Family Farms motion for summary judgment. Cactus Family Farms has not cross-appealed on any issues. Your Honor, the two issues are whether Mr. Bills' work as an animal care auditor constituted primary agriculture because he was raising livestock, or whether those duties constituted secondary agriculture because they were incident to or in conjunction with the agriculture operations of the independent contract growers that Mr. Bills visited. I want to begin by discussing the secondary agriculture issue. Your Honor, Mr. Bills' job as an employee of Cactus Family Farms was to travel to independent contract growers who were engaged in the business of raising pigs that Cactus Family Farms owned, and he would monitor the loading process as the farmers themselves and their crew were loading the pigs for slaughter, to get onto the truck for slaughter. Your Honor, secondary agriculture consists of any practices, whether or not they themselves are farming practices, which are performed either by a farmer or on the farm as incident to or in conjunction with such farming operations. And that's found in Section 203F and discussed extensively in the Supreme Court case of Holly Farms. In this case, the relevant inquiry is whether Mr. Bills' work was performed incident to or in conjunction with the farming operations of the contract growers, not whether or not they were in conjunction with or incident to Cactus Family Farms. The parties agree that... Counsel, of course, you omit from your 203 definition the including at the end, including preparation for market delivery to storage or to market or to carriers for transportation to market. That's awfully important to this case. Your Honor, in this case, that language still has to be read in conjunction with the entire Section 203, which is incident to such farming operations. So it would need to be the farmer themselves sending their own pigs to slaughter. But we're on the farm, right? Yes. We're talking about activity on the farm. Yes. So it doesn't matter who Mr. Bills was employed by. If his functions working on the farm meet that including definition with respect to the farming operation. Respectfully, Your Honor, I disagree. It does matter... Give me a case establishing I'm wrong because I'm pretty sure I'm not. Your Honor, this case is very similar to the Supreme Court case in Holly Farms. I know it's not. Okay. I mean, Holly Farms does not in any way refute what I just said. Your Honor, the test that the regulations provide under 780-144 says that the farming operations are only in connection... The practice is performed in connection with farming operations only if it constitutes an established part of agriculture, is subordinate to the farming operations involved, and does not amount to... Wait. Transportation of pigs to market, or in this case to another farm for their safety, is part of farming by the statute. Well, Your Honor, I do want to point out that the parties both agree that most of Mr... The vast majority of Mr. Bills' work was not transporting from one farm to another. It was the pigs... He's monitoring for the safety of the pigs, the loading out, the transportation process. But he's not... He's part of the team doing part of the agricultural... I mean, this is the way the case seems to me, and I don't think there's contrary authority to what I'm positing. Your Honor, respectfully, the authority says that it has to be subordinate to the farming operation. Mr. Bill does not... Wait, stop. What authority? Give me a case that uses the word subordinate. It is in the regulation 780.144, subordinate to the farming operations. Mr. Bill's work is not subordinate to the farming... Everything in the including section of the statute. It still has to be... No, you can't say that, well, because they were just fixing the fence that day to keep the cattle from escaping, that wasn't supporting the raising of the cattle. That's not the way the reg and the statute read together, in my view, and I don't think there's contrary authority. Your Honor, the supporting raising the cattle... If someone were coming onto the farm, if the farmer had contracted with someone to come and fix the fence, that would fall under secondary agriculture. Here, the farmers have not contracted with Cactus Family Farms to have Mr. Bill come in and monitor their work. Of course they have. It was part of the arrangement. That's preposterous assertion. The contractual arrangement was that the growers were doing this for the owner, Cactus Farms, and so they had contracted to get it done. Your Honor, they did not contract with Cactus Family Farms to have Mr. Bill come and monitor their work. That fits what I understand the law to be, is if it's work on the farm, it doesn't matter who is employing the member of the team, as long as the team is performing an agricultural function, operation. If you've got a case that addresses this more specifically, that's fine. Otherwise, I'll let you continue your argument. We simply have, I think, a fundamental difference as to what the statute and reg read together required. Ms. Bullock, if you would, tell us where your client was physically located at the time they were loading these hogs. Was he actually on the site? Was he in the pen with them? He was on the farm, but he was not engaged in the loading process. Well, tell me, how close was he to the physical loading of the hogs? He was standing in a location where he could watch the entire crew, watch the caretaker, whose job it was to supervise and oversee the loading process. He was on the scene. He was there for some purpose. He was there for approximately 45 minutes. To what purpose? Why was he there and what was he doing? He was there, Your Honor, because this position was created specifically because Cactus Family Farms continued to have an issue that pigs were showing up at slaughters dead or, they call it slow. I think I can say with 100% of confidence that I'm the only member of this court today. Have you ever been around loading hogs? Not loading hogs, Your Honor. No, I haven't. Well, I have to my internal sorrow. But go on. I can understand why he's there to supervise because it's very easy to get rough with hogs. They're a very intelligent animal, but they do not always listen to what you want them to do. And, Your Honor, respectfully, he wasn't there to supervise the loading process. The farmers themselves... Why was he there? You still haven't told me. He was basically there as... He was an interested bystander, an innocent bystander. He was watching the process, reporting back to Cactus Farms. If the farmers themselves were doing anything incorrect, so Cactus Family Farms could come in and correct the problem. He himself had no control over the load process. He had no control over the load crew. He wanted to make sure that it was done properly, or if it wasn't, he would report back to his higher authority. He would report back to management at Cactus Family Farms if the farmers themselves were doing something incorrect. Like shocking the hogs too much, right? I mean, that was one thing. That was one concern. So if there's too much of a shocker use, then he'd report back and then they'd have to change their activities or there'd be a discussion about that. Or he would report back and management would decide if they wanted to send somebody to the farm to work with the load crew to address those issues. But that was not Mr. Bill's job. His job was to observe and report any issues back to management, not report issues to the farmer. He wasn't doing this for the benefit of the farmer. He was doing this for the benefit of Cactus, which is his employer. Counselor, I want to ask you about the regulation. You cited the regulation, but I got to be honest with you. This is about as loosey goosey of a regulation as I've ever seen. And the regulations surrounding it actually say so. So you cited the subordinate language. But if you go to the next provision, it says you have to consider all the circumstances and the common understanding of what is agricultural and what it's not. Which gets to Judge Logan's point. And then it says the total situation will control and the result will not depend on any mechanical application of isolated factors or tests, which is a clear reference back to the three part test of the previous provision. And so what value really, other than just as a guy, a guy to the statutory language, what value is there to the regulation? I believe the regulations reflect the legislative history behind adding this provision to the statute itself. There was concern from certain members of Congress that without be on the farm or in connection to subordinate to the farm language within the statute, that if a farmer himself contracted to have someone do something like fix a fence that they would otherwise do themselves, that that would not be exempt work. Your Honor, the legislative history makes it clear that this is the contractor. This is the farmer contracting for work that they would otherwise do themselves. The farmer in these instances, they have someone doing this work. They have a caretaker on their own farms supervising and controlling the load process. They are not engaging Mr. Bills to then come and be quality assurance over that caretaker's work. I'm not sure. I'm not sure you're answering my question. I think that the real thing I'm trying to get at is it seems to me it's a guy. They're saying this. This is what definitely falls within it. But then the next provision says, but use your common sense about what's agricultural and what is not. And if something that's not listed in the previous provision is agricultural, then it's covered. Am I wrong about that interpretation? Your Honor, you do have to look at the circumstances, but you also have to look at the legislative history, which is detailed in Farmers Reservoir, which is a Supreme Court case. Your Honor, I realize that your honors may not believe that Holly Farms is instructive, but I think we believe that it is absolutely instructive. These are individuals who are employed by Holly Farms. They work on independent contract growers. Holly Farms retains title to the chickens and they have live haulers coming in, catching the chickens, caging the chickens, loading the chickens for transport and transporting them to slaughter. Holly Farms is different. I know you say it's instructive, but when I was preparing for this case, I had this conversation with my clerk and Holly Farms was about an instance in which there was no interaction, nothing whatsoever. That person really had no connection to what was going on. And in this case, I understand your point is there's no interaction with the contract farmers. But to Judge Wallman's point, he's active, at least in terms of observing what's going on and reporting it back to his superiors. Doesn't that make Holly Farms completely different? No, Your Honor. I mean, to say that they're not active in the process, the employees of Holly Farms are actually coming onto the farm and catching the chickens. Here, Mr. Bills is not even the one loading the pigs up. He is simply observing the load process. So he's one step removed from the process as to, you know, the individuals in Holly Farms. Your Honor, in regards to, I see I have about 30 seconds left. I'd like to remain, you know, reserve the remainder of my time for a rebuttal. Very good. Thank you. Thank you. Mr. Twain, is that how we say it? Twain, sir. Twain. My name is Sean Twain. I'm here on behalf of the Akelpi Cactus Family Farms. Given the questions of the court and the discussion, I'm going to step straight into some of the issues that were raised with respect to both primary and secondary agriculture. To the question as to whether or not Mr. Bills' employment or engagement has any bearing on the secondary agriculture, the answer is no. Mr. Bills was on these farms for the purpose of assessing more than just the loading of the hogs. We need to expand that a bit. The appellant has gone to great lengths to try to limit what Mr. Bills was actually doing by his own testimony and by his own reports. He was not just observing the loading and handling of the pigs, but he would also intervene at an appropriate time. The court, in its opinion, cited some examples in which it was reported the hogs were hot, they were being stressed, so Mr. Bills instructed someone on the farm to put water on them. He was there to make sure that the use of shockers, the shock poles, I've never used them, but that wasn't being overdone. We just lost you, all but lost you to that same construction noise. He did far more than just observe. He would intervene. He would stop if a loading crew, for example, was using the shockers too much or they were doing something that could put the animals at risk regarding their health or safety. He would stop. He would show them the correct way to do things. In addition, he not only watched the loading process, but he also looked at the barn. He looked at the physical facilities. He watched to make sure the biosecurity measures were being followed. For example, in one of his reports, he instructed one of the crew members to be sure his shoes were covered. That's a big part of disease control on a hog farm. In addition, he would check the air conditioning and other aspects of not only the loading of the animals onto the trailer, but also how they were being treated by the farm generally. Now, with respect to the fact that these are independent growers, independent growers have a contract, a grower's contract with Cactus Family Farms. The suggestion that I picked up in a panelist's brief was that the independent grower has no real interest in policing themselves. That the only party being benefited by Mr. Bill's observations and interventions was Cactus. In fact, that is completely not the case. An independent grower gets paid by the number and quality of the animals that come off their farm and part of Mr. Bill's job. In fact, what his job revolved around was the general welfare of the animals. That is why the district court ruled quite correctly that Mr. Bill's job fell within primary agriculture. The comments about the statute and the regulation and the discussion about that raises to me one of the primary points of this case. That is how we will define the scope of agriculture, particularly agriculture in its primary and secondary sense regarding the exemption. As agriculture continues to evolve, it changes. I will go out on a limb and suggest that at the time the statute was passed, the use of multi-locations to raise and fatten hogs was probably not even employed. That was a biosecurity measure that was employed that is now commonly employed. Council, you mentioned the regulations. I want to talk to you about that. The regulation Chief Cites, opposing Council Cites, is actually much narrower than the statute. If you read the strict plain language of it, when you use the word subordinate to, it means under or controlled by. That is just the plain. We looked up the dictionary. Those are the plain dictionary definitions. Under this particular provision, Mr. Bills is not subordinate to anyone other than Cactus Farms. If you take the plain language of this regulation, you have an uphill battle to try to prove that he is exempt under that regulation. What is your response?  As the district court pointed out, the Supreme Court of the United States, in looking at these regulations and statutes, made it clear that the legislative intent was to encompass the whole of agriculture and to do so broadly. The reason for that is simple. Agriculture is going to change, and you cannot continually go back to the Secretary or to Congress to revise the statute or the regulations every time there's a new innovation in agriculture production. Secondly, to the extent there is a conflict or a problem as between what the regulation says and what is reasonably interpreted out of the statute, the statute wins. So I would respond by saying that whatever the word subordinate means, and I agree with Your Honor, it's a hodgepodge. It was not well written. I don't think it was well thought out. I'm not sure I understand the plain meaning of the word subordinate, but it's really hard when you read the Supreme Court statute and the regulation to understand that what that means is he has to be under the direction and control of the independent grower. And what I believe it probably means is something like you come on to a farm to do work a farmer would otherwise do, like supervise the loading and the treatment of his animals, and that there's some direction that may or may not be exercised. The record is completely mute on the issue of the extent to which independent growers could direct Mr. Bills or others on their farms. So we really don't have a way to correct. Do you think, though, that the next provision scales back? I mean, I had a discussion with opposing counsel on point one, four, six, seven, eighty point one, four, six, where it says, look, we don't need to make this three part test to be all end all. Do you read it the same way? Yes. Yes, sir. And that's also in connection with the Supreme Court precedent that, you know, when we're talking about agriculture, what reasonably relates to, in this case, the raising of livestock and more specifically, the general welfare and care of the livestock. And when we look at the regulations and the statutes, one other point is it's not written in a way that's exhaustive. It makes it very clear that it includes, you know, agriculture includes these things or and gives examples. But that's no mean by no means does that limit the application, for example, to just feeding and water. And including you mentioned the including clause that I was going to ask you about this. So that's as good a time as any on the including clause. Which part of the including clause? And I understand that it's not exhaustive. I think you're right about that. But is this preparation for market? Unlike Judge Wollman, I'm familiar with farming, but not hog farming. And so so I'm wondering, is this preparation for market in terms of overseeing the loading to the meat processing plant? Or where would you put this in that including clause? It's an excellent question, Your Honor, and I'm glad you asked it because that was one of the main points I want to discuss today. Since this is a position that has never, to the best of our research, ever been reviewed by an appellate court. We have to find a distinction, as you said, between processing and production. You find that, for example, in grains. You have certain activities on a farm where the production and harvesting of grain. But once the grain is delivered and it's being processed and turned into food, then that's the processing part of the line. So a line is drawn between production and processing. Here, unlike Holly Farms, which was integrated, this is not integrated. The independent growers and cactus raise the animals to the point that they're being loaded for delivery to market. The job duties of Mr. Bills was surrounding around the general welfare of the animals. At the time, they were still being, if you will, part of the production process. Both cactus and independent growers have an interest in that so that more animals, healthier animals, and animals that are fatter and more marketable. Contrast that with delivery of the animals, let's say, to a slaughterhouse that has hog pens out its back door. You deliver the hogs to that pen. They stay there, and they're fed and watered until they go in, and then they're butchered and the meat processed and packaged. The regulations do make a distinction between a location like at the stockyard as opposed to the actual farm. The important distinction is that Mr. Bills' activities, in fact, his purpose, the purpose for his job, was to be done on the farm, not at the packer. Let me just, Mr. Twain, let me just step in here, because as I understand the way this case law has developed, if the growers are—the growers driving delivering to the slaughterhouse is exempt. It's only when an independent business comes in and is hired to transport the pigs to the slaughterhouse that it becomes not—that their drivers are not exempt. So you're focusing, I think, more on the delivery between the farms for the interim delivery, so to speak, either one or two, which I would call primary agriculture. I want counsel to respond to that. The notion that these pigs, under modern health standards, have to be transported at least once and some twice before they're ready to be delivered to the slaughterhouse. Have I got that right? Yes, sir. So that, it seems to me, would be primary agriculture. Yes, sir. Without question. And anyone on the farm involved in that, it seems to me, is clearly secondary, but probably primary. It's only when you get to delivering to the slaughterhouse that the line between—that you're talking about, between production and processing, becomes harder to draw. Yes, sir. Again, remember, Mr. Bill's job duties end once the animals are on the trailer and taken by somebody else to the slaughterhouse. And that's another reason why the line between production and processing makes sense, because that gives us something to gauge, you know, the point and purpose of a person's job duties for purposes of applying the agriculture exemption. I want to get back—go ahead, Judge Wallman. Counsel, I want to make sure that I understand your theory of the case. You're relying solely upon the primary agricultural exemption? No, sir. We believe the court correctly applied the primary and secondary exemption to Mr. Bill's work and found that the exemption applied in both contexts. I have one minute, so I'd like to just briefly step back through the primary one more time. Counsel, before you move on, I want to ask my question one more time. So, we've got that including list, and I just need a simple answer. Is this preparation for market, delivery and storage, or to market or to carriers, for transportation to market, or none of the above? With regard to what Mr. Bill was saying, where on the including clause do his duties fall? His duties fall with respect to animal welfare in connection with the loading to send the animals to market. I'm hearing you say it's not included within the including clause, that you would say it's general welfare and not preparation for market or delivery to storage or anything like that. Well, it's preparation for market to the extent that the general welfare of the animals and the humane treatment relates to the preparation for market and the loading. So, I think there's points of convergence with his job and that laundry list. Okay. Let's see. Does Ms. Pollock have some time? I'll give you two minutes. It's a complicated case. Thank you, Your Honor. I would like to start with addressing a statement that Mr. Twain made that the independent grower gets paid for the pigs that are coming into slaughter and how many are dead or alive. Your Honor, in the appendix, the joint appendix starting on page 61 is the defendant's response to plaintiff's statement of facts. Fact number 38 is contract growers are paid by cactus on a fixed per pig basis, and they have admitted that fact. The farmers themselves do not get paid. They get paid whether the pigs show up dead or they show up alive. Their interest is the interest in the health of the pigs is not the same as the interest of cactus family farms, which is only going to get paid by the slaughterhouse if the pigs show up alive. Your Honor, in regards to the opposing counsel statements that Mr. Bills was engaged in the general care, which amounts to primary agriculture. The only primary agriculture that could be occurring here is the raising of livestock and providing general care in the abstract. Here, Mr. Bills would step in if there was animal abuse is not raising the livestock as it's contemplated by either the case law or the regulations because the regulations specifically contemplate that the individual has to be doing that for a substantial amount of time. Counsel, that brings up the question I wanted to ask you. Would you agree that that the transportation of the pigs between farms for the under these new notions of bio safety is primary agriculture? It's part of raising your honor. No, I believe that that would be part of transportation. It would not be part of the race. Wait, wait, wait. Why? Why is transportation on its face? Not part of raising cattle. Even if transportation is, that's not Mr. Bills job. His job is to observe. No, that wasn't my question. Do you agree that that part of raising pigs in today's agriculture is requires transporting them at least once between locations to avoid the development of disease and so forth? Yes, part of the raising process involves transporting them between one farm, at least possibly two. And that means it's primary agriculture that function. That operation. The operation of transporting them. Maybe, but that's not Mr. Bill's his job. That's a different question. Thank you. I think you, I think you, I mean, I, I think you have to agree with it, but I'm, I'm, you're not very happy about it. Could I ask one follow up question, which is on that point? Yeah, on that point, my understanding, and please correct me if I'm wrong. I meant to ask the opposing counsel, but I think it's undisputed that Mr. Bill's essentially spent 45 minutes to an hour with each group. That was the approximate average time he spent. And, of course, he was observing. So, I mean, you can, but is that the correct amount of time? Was it sort of like a short period of time with each group of hogs? Yes, your honor. He would spend no more than 75 minutes with any group is what has been. It's undisputed by both parties. Thank you. Counsel case. Well, argued and argument helps. So we will take it under advisement.